**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**v.**                                  **Case No. 4:22-cr-00049-LPR-1**

**MARK ODOM**                                                         **DEFENDANT**

<u>**ORDER**</u>

This Order resolves Mr. Odom's Motion to Suppress.[1]  After full briefing, the Court held a suppression hearing.[2]  At that hearing, the Court heard from three fact witnesses called by the United States.  Through counsel, Mr. Odom questioned each witness.  He did not, however, call any witnesses of his own.  Upon the close of evidence, counsel for both parties presented legal arguments.  After the hearing, and with consent of counsel from both parties, the Court watched United States' Exhibit 16—three video clips of the custodial interrogation of Mr. Odom.[3]  The Court's findings of fact (set out below) are based on the testimony given, and the exhibits admitted, at the suppression hearing.  The Court's conclusions of law are based on its findings of fact, as well as the legal arguments presented in writing and orally by the parties.

**Findings of Fact**

A few threshold points are worth making up front.  First, the following findings of fact are made by a preponderance of the evidence.[4]  An alleged fact is established under this standard if it

---

[1] Doc. 62.

[2] *See* Clerk's Minutes (Doc. 85).

[3] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:33:29–48, 12:43:07–22.

[4] *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

1

is more likely than not that the fact actually happened.[5]  Second, which party bears the burden of proof in this case is a little quirky.  With regard to facts that go to whether Mr. Odom has standing to challenge his detention, the search of the motel room, and the statements he made during the custodial interrogation, Mr. Odom bears the burden of proof.[6]  But with regard to facts that go to whether the detention, the search, and the interrogation were constitutional, the United States bears the burden of proof.[7]  Third, even where this Order does not expressly say so, any of the following findings of fact that resolve disputed factual issues should be read to include an implicit determination that the evidence contrary to the particular finding was overborne by the evidence supporting the particular finding.  Now, onto the actual findings.

     1.     On April 20, 2022, law enforcement arranged for a Confidential Source ("CS") to make a controlled buy of narcotics.[8]

     2.     The CS was working off one or more criminal charges.[9]  This means that he was working with law enforcement in exchange for the elimination, reduction, or mitigation of pending or potential charges.[10]

---

[5] *See, e.g.*, *United States v. Soileau*, 686 F.3d 861, 867 (8th Cir. 2012) ("[P]reponderance of the evidence simply means it is more likely than not that an event occurred . . . .").

[6] *See United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) ("A passenger has standing to challenge his detention because all occupants of a stopped vehicle are subject to a Fourth Amendment seizure.");  *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)) ("The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched.") (internal quotation marks omitted);  *United States v. Bruton*, 416 F.2d 310, 312 (1969) (recognizing standing as the "[t]he threshold question" in the Court's analysis of a defendant's challenge to the admissibility of a confession made after an alleged Fourth Amendment violation).

[7] *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure").  *See also United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)) ("The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary") (internal quotation marks omitted).

[8] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 9:21:09–23, 10:20:26–10:21:16.

[9] *See id.* at 10:20:09–20.

[10] *See id.* at 10:20:14–20.

3.        The CS had been a source in the past for at least one of the officers involved in the instant case.[11]  That officer—Ryan Temple—is now a Sergeant with the North Little Rock Police Department.[12]  At the time of the controlled buy in this case, Temple was a Narcotics Investigator for the North Little Rock Police Department.[13]  (For clarity, the Court will refer to Temple as Investigator Temple.)

4.        Investigator Temple explained that, on the previous occasions that he had worked the CS, the CS proved reliable:

> Q: In the case of Mr. Odom, did you work with a confidential informant?
>
> A: I did.
>
> Q: Have you worked with this confidential informant in the past, prior to Mr. Odom?
>
> A: I have.
>
> Q: Has that informant been reliable?
>
> A: He has.
>
> Q: How did you determine his reliability?
>
> A: Corroborating information and arrests that we had on previous occasions we worked.[14]

The Court finds this testimony credible and adopts it as fact.

5.        Before the controlled buy, Investigator Temple and another narcotics officer—Investigator Jarod Maynard—met with the CS.[15]  In the presence of at least one of the officers, the

---

[11] *See id.* at 10:19:42–10:20:05.

[12] *See id.* at 10:17:20–25.

[13] *See id.* at 10:18:30–35.

[14] *Id.* at 10:19:42–10:20:05.

[15] *See id.* at 9:21:30–51.  Before the Investigators met with the CS, the CS informed them "that he could make a purchase of methamphetamine from a subject known as Chubbs . . . . "  *See id.* at 10:20:39–43.

CS made a recorded phone call to an individual he knew by the name of "Chubbs."[16]  At this time, neither the CS nor the officers knew that individual's real name.[17]  After the CS contacted Chubbs to buy narcotics, Chubbs told the CS to meet him at the Rest Inn at 5801 Pritchard Road in North Little Rock.[18]

6.      Investigators Temple and Maynard searched the CS to ensure he had no contraband on him or in his car.[19]  They found no contraband.[20]  They did not do a cavity search.[21]  They gave him $400 to buy a half-ounce of methamphetamine.[22]

7.      The CS then drove his car to the Rest Inn.[23]  Investigators Temple and Maynard followed the CS.[24]  It is not clear how closely they followed the CS during this drive.[25]

8.      From about a football field away, the Investigators observed the CS pull into the motel parking lot and then wait for Chubbs to arrive.[26]

---

[16] *See id.* at 9:22:00–07, 10:20:50.

[17] *See id.* at 9:21:40–43.

[18] *See id.* at 9:22:11–19, 10:20:50–59.

[19] *See id.* at 9:22:07–15 ("After searching the confidential informant and his vehicle, we were directed by Chubbs to the Rest Inn[.]").  *See also id.* at 10:21:05–11 ("[P]rior to completing the purchase of narcotics, the informant was searched . . . .").

[20] *See id.* at 10:21:11–16 ("[H]is person was searched for contraband, none was located.").

[21] *See id.* at 9:59:10–12.

[22] *See id.* at 9:21:51–9:22:00; 10:21:17–21.

[23] *See id.* at 9:22:29–33.

[24] *See id.* at 9:22:31–33, 10:34:51–54.

[25] *See id.* at 9:22:29–33 ("The confidential informant was in his respective vehicle, we were in our vehicle, we followed the confidential informant there.").

[26] *See id.* at 9:45:41–51.

9.      A red car pulled into the Rest Inn parking lot.[27]  The Investigators saw a white male exit the red car and walk over to the CS's vehicle.[28]  The Investigators then saw a "hand to hand transaction . . . take place" and "[t]he white male subject got back into the red vehicle and left."[29]

10.      One of the Investigators had, but did not use, binoculars.[30]  They did not video or photograph the encounter between the CS and the man from the red car.[31]

11.      The Court finds that the man from the red car sold the CS methamphetamine. Specifically, that man gave the CS methamphetamine in exchange for $400 in cash.

12.      After the encounter ended, the Investigators followed the CS to a pre-determined meeting location.[32]  The CS drove his car.[33]  The Investigators followed in their cars.[34]  It is not clear how closely they followed the CS during this drive.[35]

13.      Once they all met up, the CS gave the Investigators the methamphetamine that he bought from the man in the red car.[36]  The Investigators searched the CS and his car for contraband.[37]  They did not find any.[38]  They did not conduct a cavity search.[39]

---

[27] *See id.* at 9:22:33–39, 10:21:33–37.

[28] *See id.* at 9:22:39–42, 10:21:37–40.

[29] *Id.* at 9:22:42–49.

[30] *See id.* at 9:46:08–27.

[31] *See id.* at 9:46:53–9:47:25.

[32] *See id.* at 9:22:49–59.

[33] *See id.* at 9:22:49–53.

[34] *See id.* at 9:22:53–55.

[35] *See id.* at 9:22:49–55 ("The confidential informant left in his vehicle at which time we followed [the CS] back to a predetermined location . . . .").

[36] *See id.* at 9:22:55–59, 10:22:07–25.

[37] *See id.* at 9:23:07–13, 9:23:26, 9:59:01–05, 10:22:15.

[38] *See id.* at 9:23:14–18, 10:22:15–19.

[39] *See id.* at 9:59:07–10.

14.    The CS told the Investigators that the man who sold him the methamphetamine was the man he knew as Chubbs.[40]  The CS described Chubbs as follows:

> [A] white male [that has] sleeved tattoos covering both of his arms. . . . [H]e actually stays at 5801 Prichard in one of the rooms there . . . [and] has a girlfriend that goes by Katie, [who] [the CS] believes [was] a basketball player and she's very tall for a female, she has blond[e] hair."[41]

15.    Based on the CS's description of Chubbs, Investigator Maynard thought he might know Chubbs's real identity.[42]  Investigator Maynard had recently been assigned a different narcotics case in which a man and woman were recorded on a traffic stop video.[43]  Investigator Maynard recalled that the man and woman from the video fit the CS's description of Chubbs and his girlfriend.[44]

16.    The man in the traffic stop video (in the other case file) had been previously identified as Mark Odom.[45]  The Investigators showed the CS a picture of Mark Odom.[46]  The CS told the Investigators that the man in the picture was the man he knew as Chubbs and the man who just sold him methamphetamine.[47]

---

[40] *See id.* at 9:21:24–29, 9:23:46–9:24:01.

[41] *Id.* at 9:23:55–9:24:20.  Another officer recalled the CS's description of Chubbs as "a white male [who] basically had head[-]to[-]toe tattoos . . . [s]taying at the Rest Inn with a girlfriend that was tall by the name Katie, blond[e] hair, and . . . she was possibly a basketball player at some point for a college."  *See id.* at 10:22:33–50.

[42] *See id.* at 9:24:23–9:25:18.

[43] *See id.* at 9:24:33–54 ("So based on that description, I immediately thought it could be Mark Odom and the female described as Katherine Ste[a]rns.  Reason being I was currently working a case file where Mark Odom had been arrested the previous month with methamphetamine and that file got assigned to me.  It was currently on my desk at this very time.").

[44] *See id.* at 9:24:54–9:25:02 ("I had to view the traffic stop video so I saw what Ms. Ste[a]rns looked like.  I saw what Mr. Odom looked like.").

[45] *See id.* at 9:25:12–18.

[46] *See id.* at 10:23:07–12 ("I obtained a picture of Mark Odom of a previous case file we had, and that was shown to the informant . . . .").  *See also id.* at 11:44:17–21 ("The C[S] is shown a picture of Mr Odom . . . .").

[47] *See id.* at 10:23:12–16 ("[T]he informant ID'd Mark Odom as Chubbs.").  *See also* at 11:44:17–21 ("The C[S] . . . identifies [the man in the photo] as Mr. Odom.").

17.     Law enforcement searched for Mark Odom on Facebook.[48]  They found United States' Exhibit 1, which is a profile page for "Mark Odom (Chubbs)."[49]  The Defendant appears in the profile picture.[50]

18.     On April 21, 2021, Investigator Maynard learned that Mr. Odom and Katherine Stearns both had parole search waivers on file.[51]  The parole search waivers authorized "any certified law enforcement officer [to] conduct a warrantless search of [the parolee's] person, place of residence, or motor vehicle at any time, day, or night . . . ."[52]  Each waiver went on to say that the parolee understood "that a warrantless search based on this waiver must be conducted in a reasonable manner but does not need to be based on a clearly expressed suspicion that" the parolee is "committing or [has] committed a criminal offense."[53]

19.     Also on April 21, 2021, Investigator Temple spoke by phone with the CS.[54]  The CS told Investigator Temple that Mr. Odom had gotten more narcotics and was at the motel in Room 101.[55]

---

[48] *See id.* at 9:25:20–40 ("[S]omebody in the office looked up Mark Odom on Facebook . . . and when they pulled his Facebook up, in parentheses besides Mark Odom, it says Chubbs.").

[49] *See id.* at 9:25:41–9:26:49;  Pl.'s Ex. 1.

[50] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 9:26:21–33 (identifying the tattooed man in the Facebook photos as "the individual that is sitting here in the courtroom").

[51] Pl.'s Exs. 2, 3.

[52] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 9:27:42–48 ("I learned that [Mr. Odom] and his girlfriend both had warrantless search waivers on file from being on parole and probation.").  *See also id.* at 9:29:17–44 (identifying Plaintiff's Exhibit 3 as "a warrantless search waiver for Katherine Ste[a]rns").  It is not exactly clear when Investigator Maynard learned this, but it is clear that he learned it prior to April 22, 2021—the day of Mr. Odom's arrest. *See id.*

[53] *See id.* at 9:28:33–58.  *See also* Pl.'s Exs. 2, 3.

[54] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 10:23:30 ("On April 21st, my confidential informant had called me[.]").

[55] *See id.* at 10:23:30–39 ("[The CS] advised me that Chubbs was at the hotel and had just reup[p]ed on methamphetamine and had a large amount with him.").  *See also id.* at 10:25:49–59 (CS telling Investigator Temple that Mr. Odom was in Room 101).

20.     On April 22, 2021, Investigator Temple spoke to the CS again.[56]  The CS told him

that Mr. Odom still had a large amount of narcotics.[57]  So Investigator Temple decided to surveil

Room 101.[58]

21.     At around 1:30 p.m. that day, Investigator Temple arrived at the Rest Inn.[59]  A

minute or so later, Mr. Odom exited Room 101 and left the Rest Inn by car.[60]  He was with someone

else and that other person was driving.[61]  Investigator Temple followed the car at a distance,

attempting to conceal his presence.[62]  Other officers also followed.[63]

22.     Shortly thereafter, Investigator Temple saw the car that Mr. Odom was riding in

turn without a turn signal.[64]  Investigator Temple instructed some of the other officers to initiate a

traffic stop.[65]  Investigator Temple drove on, again attempting to conceal his presence.[66]  He heard

statements on the police radio concerning the traffic stop.[67]

23.     The Court finds that the traffic stop occurred around 1:35 p.m.[68]

---

[56] *See id.* at 10:26:34–40.

[57] *See id.* at 10:26:40–44.

[58] *See id.* at 10:26:47–53 ("[S]o I went to 5801 Prichard to establish surveillance on the room.").

[59] *See id.* at 10:40:04–36.

[60] *See id.* at 10:26:59–10:27:11 ("In a minute or less, I see Mr. Odom exit room 101 and enter the passenger side of a silver vehicle.").

[61] Mr. Odom was sitting in the passenger seat during the drive.  *See id.* at 10:27:07–42.

[62] The car passed Investigator Temple, so he "followed the vehicle down Pritchard Road to 161."  *See id.* at 10:27:19–22.  Investigator Temple followed the silver car until it was pulled over, then he continued "down the road somewhere just to maintain [his] undercover capacity."  *See id.* at 10:27:19–54.

[63] *See id.* at 10:27:26–35.

[64] *See id.* at 10:27:26.

[65] Investigator Temple instructed officer Edwards "to conduct a traffic stop for the violation."  *Id.* at 10:27:26–35.

[66] *See id.* at 10:27:45–54.

[67] *See id.* at 10:27:55–10:28:03 ("It was coming to me through radio of what was going on and that they had Mr. Odom detained and we were taking him back to the hotel room.").

[68] The officers arrived at the Rest Inn at "[a]pproximately 1:30 in the afternoon" and "[i]n a minute or less, [the officers] [saw] Mr. Odom exit room 101 and enter the passenger side of a silver vehicle[]" that was stopped by officers shortly thereafter.  *Id.* at 10:26:53–10:27:35.

24.     The law enforcement officers conducting the traffic stop did not issue the driver a ticket.[69]  Instead, they immediately homed in on Mr. Odom.[70]  After confirming his identity and the fact that he had a parole search waiver on file, they made Mr. Odom exit the car, questioned him, and searched him.[71]  They found two cell phones, $674 dollars, and a plastic electronic key card on Mr. Odom.[72]  The key card apparently looked like a motel key card, but the testimony includes no further description of it and no discussion of whether the card colors or logo (if it had colors and a logo) matched the cards used at the Rest Inn.[73]

25.     The driver was fairly quickly allowed to leave the scene in his car.[74]  But the police did not let Mr. Odom leave.[75]  They wanted to take Mr. Odom back to the Rest Inn to search Room 101.[76]  They placed him in handcuffs and put him in the back of a police car.[77]  And they drove him to the Rest Inn parking lot.[78]  He remained in the police car during the subsequent search of Room 101.[79]

---

[69] *See id.* at 10:39:27–31.

[70] *See id.* at 10:40:04–36.

[71] *See id.*

[72] *See id.* at 10:28:14–20, 10:28:38–39, 10:40:29–36.

[73] *See id.* at 10:41:32–42.

[74] *See id.* at 10:39:35–39.

[75] *See id.* at 10:40:04–07.

[76] *See id.* at 10:28:01–10:28:03 ("[T]hey had Mr. Odom detained and . . . were taking him back to the hotel room."). *See also id.* at 10:28:42–10:28:51 ("Mr. Odom was taken back by one of the patrol officers . . . .").

[77] *See id.* at 11:02:06–19.

[78] *See id.* at 10:28:42–51 ("Mr. Odom was taken back [to the Rest Inn] by one of the patrol officers . . . ."). *See also* at 11:02:14–19 ("[Police] carried him back to the hotel room in which they conducted a search of it.").

[79] *See id.* at 10:28:53–58.

26.     The police car in which Mr. Odom sat arrived back at the Rest Inn around 1:50 pm.[80]  Investigator Temple met up with the other law enforcement officers back at the Rest Inn.[81]  At this point, no officer had yet attempted to enter Room 101.[82]

27.     Room 101 was directly accessible from the parking lot, without the need to walk into a motel lobby.[83]  Officers at the scene tried to open the door to Room 101 by using Mr. Odom's electronic key card.[84]  The testifying Investigators present at the scene did not remember which officer tried the door with Mr. Odom's card.[85]  In any event, the door did not open.[86]

28.     Officers present at the scene went to the motel's front desk and returned with a key card that unlocked Room 101.[87]  None of the witnesses remember which officer retrieved the key card from the front desk.[88]  And thus, unsurprisingly, none of the witnesses testified as to what occurred at the front desk when the key card was obtained.

---

[80] See id. at 10:29:03–10 (approximating that ten minutes had passed between the time of the traffic stop and the time officers got back to the hotel room).

[81] See id. at 10:27:56–10:28:03, 10:28:48–51.

[82] See id. at 9:31:17–24 ("When I got there, I was waiting on the door to get open so we could go in and conduct a warrantless search of their room.").

[83] See id. at 11:50:57–11:51:20.

[84] Investigator Maynard "was present on the premise[]" when "officers tried to use a key they found on Mr. Odom to get in the room[.]"  See id. at 9:54:37–52.  See also id.  at 9:31:17–21 ("When I got there, I was waiting on the door to get open so we could go in and conduct a warrantless search . . . .").  Investigator Temple couldn't "say whether it was [him]self or one of the patrol officers, but somebody did attempt to use the key."  See id. at 10:29:41–44.

[85] See supra note 84.  See also id. at 10:40:59–10:41:03.

[86] See id.  at 9:54:50–52, 9:55:50–9:56:01, 9:56:14–16.

[87] See id.  at 9:31:44–45, 10:29:50.

[88] Investigator Maynard recalled that "[a] key was obtained[.]"  See id.  at 9:31:44.  Investigator Temple was not the one who personally got the key from the front desk, but officers "obtained a key from the front office from management."  See id.  at 10:41:49–59.

29.     The Investigators used the newly retrieved key card to open the door to Room 101.[89] Upon entering the room, they saw a woman (later identified as Katherine Stearns) run into the bathroom.[90]  Ms. Stearns was detained.[91]

30.     The Investigators photographed and searched the room.[92]  Some of the photographs have been admitted as United States' Exhibits 5–14.[93]  The room was very messy.[94]  There was stuff everywhere, as if someone had lived there for a significant period of time.[95]  The best evidence of what the room looked like is the pictures taken upon entry—particularly United States' Exhibits 5 and 6.[96]  The Court finds them to be a true and accurate representation of what the room looked like before the police began their search.

31.     In the room, the police discovered over $900, two digital scales, a syringe, some marijuana, and more than 2.2 pounds of methamphetamine.[97]

32.     After conducting the search, Investigator Temple went to the front desk and obtained a receipt for Room 101, which included a copy of the registration card filled out by guests of the motel.[98]  The registration card showed the room having been rented to Ms. Katherine Stearns

---

[89] *See id.* at 9:31:44–51.

[90] *See id.* at 9:31:51–9:32:00, 10:30:01–05 ("Officer Lester was there, Ms. Ste[a]rns was in the room, [and] she quickly went to the bathroom to the rear of the room . . . .").

[91] *See id.* at 10:30:08.

[92] *See id.* at 9:41:43–48.

[93] *See* Pl.'s Exs. 5–14.

[94] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 10:31:39–10:32:13.

[95] *Id.* at 10:31:44–50.

[96] *See id.* at 9:33:11–18 (describing the room as having clothing and bags everywhere).  *See also id.* at 10:31:53–10:32:11 (describing clothes and trash everywhere in the room).  Investigator Temple recalled Room 101 looking like the Exhibit 5 photo on the day he entered the room.  *See id.* at 10:31:53–10:32:13.

[97] *See id.* at 9:40:29–9:43:43.

[98] *See id.* at 10:33:34–37.  *See also* Pl.'s Ex. 4.

11

on February 28, 2021.[99]  Where the registration card asked for "No. in Party[,]" someone had filled in "2[.]"[100]

33.     At some point during or after the search, Mr. Odom was transported to the police station.[101]  The record does not reflect the time he arrived at the police station.  However, the record does make clear that, at 3:10 p.m., he was placed in an interrogation room.[102]  Then, at 3:30 p.m., Investigator Tyler Barber and DEA Task Force Officer Mitchell Zimmerman entered the room and began the interview with some preliminary background questions.[103]  Neither of those law enforcement officers had taken part in the seizure of Mr. Odom or the search of Room 101 at the Rest Inn.[104]

34.     At approximately 3:40 p.m., one of the Investigators went over with Mr. Odom the Miranda warnings.[105]  Mr. Odom acknowledged that he understood his rights, both verbally and by initialing the appropriate boxes on the Miranda form.[106]  Mr. Odom signed the form waiving his rights and agreeing to speak with law enforcement.[107]  Over the next hour or so, Mr. Odom made many incriminating statements, including claiming ownership of the illegal drugs in the

---

[99] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 9:53:06–25.  *See also* Pl.'s Ex. 4.

[100] Dec. 18, 2023 Hr'g Tr. (Rough) at 9:34:19–20; 10:51:35–59.  *See also* Pl.'s Ex. 4.

[101] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 10:33:40–42 ("Then we went back to North Little Rock Police Department to do property evidence interviews.").

[102] *See* Pl.'s Ex. 16 at 15:10:10.  This exhibit is the video of Mr. Odom's custodial interrogation.  This Order cites to the timestamps in the top left corner of the video.

[103] *See id.* at 15:30:04–15:38:40.

[104] Prior to interviewing Mr. Odom, Investigator Barber had never had any prior contact with Mr. Odom.  *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 10:57:51–10:58:01.  And there is nothing to suggest that Officer Zimmerman had any such prior contact.

[105] *See id.* at 10:58:29–39, 11:08:20–26.  *See also* Pl.'s Ex. 16 at 15:38:51–15:40:33.

[106] *See* Pl.'s Ex. 16 at 15:39:48–15:40:33;  Pl.'s Ex. 15.  *See also* Dec. 18, 2023 Hr'g Tr. (Rough) at 11:01:35–41.

[107] *See* Pl.'s Ex. 16 at 15:40:34–40.

motel room and admitting to selling illegal drugs.[108]  He confirmed that he had slept in Room 101 the night before his April 22, 2021 arrest.[109]  He also admitted to living in Room 101 on and off for at least a month in the run-up to his arrest.[110]

**Conclusions of Law**

As in many motions to suppress, the first question here is one of standing.  Mr. Odom has standing to challenge his detention, the search of Room 101, and the use of the statements he made during the subsequent custodial interrogation.  The United States does not suggest Mr. Odom lacks standing to challenge his detention or the use of his statements.  Nor could it.  A person who is detained has standing to challenge his detention.[111]  A person who makes statements during a custodial interrogation has standing to challenge the use of his own statements at trial.[112]  The United States does dispute Mr. Odom's standing to challenge the search of Room 101 at the Rest Inn.[113]  The United States is wrong.  Mr. Odom has, at the very least, shown that he was an overnight guest of Ms. Stearns in Room 101 on April 22, 2021.[114]  And the caselaw leaves little doubt that an overnight guest of a person renting a motel room has a subjective expectation of privacy in the motel room that society is prepared to recognize as reasonable.[115]  This alone suffices to establish Mr. Odom's standing to challenge the search.

---

[108] *See id.* at 15:41:01–16:45:38.

[109] *See id.* at 15:41:28.  *See also* Dec. 18, 2023 Hr'g Tr. (Rough) at 11:01:56–11:02:40;  Pl.'s Resp. in Opp. to Def.'s Mot. to Supress (Doc. 67) at 4.

[110] *See* Pl.'s Ex. 16 at 15:42:29.  *See also* Dec. 18, 2023 Hr'g Tr. (Rough) at 11:02:31–34.

[111] *See Brendlin v. California*, 551 U.S. 249, 251 (2007) (explaining that a passenger during a traffic stop is "seized within the meaning of the Fourth Amendment . . . and so may challenge the constitutionality of the stop").

[112] *See, e.g.*, *Dunaway v. New York*, 442 U.S. 200, 216–19 (1979) (recognizing a defendant's ability to challenge the admissibility of a confession that he made after an alleged Fourth Amendment violation).

[113] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 11:34:38–11:41:36.

[114] *See id.* at 12:10:49–56 (conceding that Mr. Odom was an overnight guest).

[115] *See, e.g.*, *United States v. Mattox*, 27 F.4th 668, 674 (8th Cir. 2022) ("[O]vernight guests in . . . hotel rooms have a reasonable expectation of privacy.").

While he has standing to challenge his detention, the search, and the use of his statements, Mr. Odom's challenges all fail.  With respect to Mr. Odom's detention after law enforcement pulled over the car in which he was a passenger, law enforcement had probable cause to believe that Mr. Odom had committed a felony two days prior to that encounter.[116]  Law enforcement has probable cause to believe a crime has been committed when, upon the totality of the circumstances, there are facts "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched."[117]  The probable cause analysis is an objective one.[118]  It does not seek to know whether a particular officer or group of officers subjectively believed they had probable cause.  Instead, the inquiry is whether a hypothetical reasonable officer would have had probable cause given what the officers collectively knew at the time.[119]

In this case, law enforcement had conducted and overseen a controlled buy using a CS.[120] They witnessed the buy from afar, essentially confirming that the buy took place.[121]  They got a description of the seller from the CS, which was so good that they quickly identified the seller's real identity (Mr. Odom) from another case they were working.  And the CS confirmed that the identification was correct from a picture.  Additionally, law enforcement found the seller's

---

[116] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 9:24:33–9:25:54.

[117] *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (quoting *U.S. v. Wells*, 223 F.3d 835, 838 (8th Cir. 2000)) (internal quotation marks omitted).

[118] *See United States v. Stratton*, 453 F.2d 36, 38 (8th Cir. 1972) ("The test of probable cause is not the articulation of the policeman's subjective theory but the objective view of the facts.") (internal citations and quotation marks omitted).  *See also Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("The principal components of a determination of . . . probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause.").

[119] "Probable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (internal quotation marks omitted).

[120] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 9:21:09–23, 10:20:26–10:22:25.

[121] *See id.* at 9:22:29–39, 9:45:41–51, 9:46:30–38.

14

Facebook page that directly linked him to the street name he used with the CS.  Add to this that the CS had proven reliable in the past.  Also add to this that the CS's information about Mr. Odom staying in Room 101 was at least partially corroborated when law enforcement began to surveil Room 101.  In short, there's more than enough information here to establish probable cause to believe that Mr. Odom sold methamphetamine to the CS on April 20, 2021.

Under governing precedent, there is no question that police may, without a warrant, arrest a person when (1) they have probable cause that person has committed a felony, and (2) that person is in public.[122]  That's really the end of the analysis.  If law enforcement could constitutionally arrest Mr. Odom at the traffic stop, they certainly could constitutionally detain him, bring him to the site of the motel search, and then take him to the police station.  At the suppression hearing, Mr. Odom expressly conceded the point.[123]

The constitutionality of the motel room search is a much closer call—much, much, closer.  To try and establish the search's constitutionality, the United States primarily relies on the parole search waiver signed by Mr. Odom.[124]  Recall that this search waiver allows warrantless searches of Mr. Odom's "place of residence."[125]  So far, so good for the United States.  But there is a quirk.  The Rest Inn is not the residence that Mr. Odom listed on his parole forms.[126]  In such circumstances, caselaw teaches us that law enforcement may rely on Mr. Odom's parole search waiver to justify the search of the motel room only if—before the search began—they had probable

---

[122] *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.").  Mr. Odom made clear that he was not challenging the constitutionality of the traffic stop.  *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:28:53–12:29:24.

[123] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:28:53–12:29:24.

[124] *See id.* at 12:02:11–12:04:29.

[125] *See id.* at 9:28:23.  *See also* Pl.'s Ex. 2.

[126] *See id.* at 12:05:10–47.

cause to believe that Mr. Odom was residing in Room 101 at the motel.[127]  The definition and analysis of probable cause here is the same as already set out above, with the caveat that the officers are trying to determine where a person is residing instead of whether he committed a crime.[128]

Here's the information law enforcement had before they opened the door to Room 101. They were told by a CS that the CS could buy methamphetamine from a man with the street name Chubbs.  This CS had worked with them in the past and proven reliable on more than one occasion. They set up the buy.  They witnessed the buy from afar.  They knew Chubbs had told the CS that the buy should occur at the Rest Inn motel.  The buy actually did occur in the parking lot of the Rest Inn motel.  Again, the CS had proven reliable.  Then, the CS described Chubbs and his girlfriend so well that the Investigator recalled a couple matching that description on video in a separate narcotics case.  The Investigator showed a picture of the man in that other case to the CS, who confirmed it was Chubbs.  This information was then corroborated when law enforcement found a Facebook profile page under the name "Mark Odom (Chubbs)" with a picture that generally matched the picture shown to the CS.  Again, the CS had proven reliable.

The buy occurred on April 20, 2021.  On that day, the CS told law enforcement that Mr. Odom was "[s]taying at the Rest Inn with a girlfriend . . . ."[129]  On April 21, 2021, and on April 22, 2021, the CS told law enforcement (by phone) that Mr. Odom had more methamphetamine and was at the motel in Room 101.  This information was at least partially confirmed when, on April 22, 2021—just a minute or so after law enforcement began to surveil

---

[127] *See Thabit*, 56 F.4th at 1151 ("An officer must have probable cause to believe a dwelling is the residence of a parolee in order to initiate a warrantless search of a residence not known to be the home of a parolee.").

[128] *See id.* at 1151;  *supra* at pp. 13–14.

[129] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 10:22:42.

Room 101—Mr. Odom exited from that room.  And during the traffic stop, law enforcement found what appeared to be a motel key card on Mr. Odom.

The foregoing is enough to establish probable cause that Mr. Odom was residing in Room 101, thus rendering the search constitutional pursuant to his parole search waiver.  Arkansas caselaw makes clear that a person can have more than one residence, and that the test for determining a person's residence is fairly flexible:

> Under our case law, the distinction between the terms "domicile" and "residence" is often subtle; however, this court has consistently held that the terms are not synonymous.  *In Re: Adoption of Samant*, 333 Ark. 471, 970 S.W.2d 249 (1998) (citing *Stephens v. AAA Lumber Co*., 238 Ark. 842, 845, 384 S.W.2d 943, 945 (1964)).  A person's "residence" is the place of actual abode, not a home that a person expects to occupy at some future time.  *Id*.  This court has defined "place of abode" as "something more than a place of temporary sojourning," implying a degree of permanence.  *Shinn v. Heath*, 259 Ark. 577, 587, 535 S.W.2d 57, 62 (1976) (quoting *Cravens v. Cook*, 212 Ark. 71, 74, 204 S.W.2d 909, 910 (1947)).  "[A] given place may be a 'place of abode' of a party, though he may be actually absent therefrom for a long period of time."  *Id*.  No particular length of time is necessary to establish residence.  *See Cole v. Cole*, 233 Ark. 210, 343 S.W.2d 561 (1961); *Smith v. Smith*, 219 Ark. 876, 245 S.W.2d 207 (1952).  Rather, the key consideration is whether the place is an "established abode, fixed permanently for a time for business or other purpose, although there may be an intent existing all the while to return at some time or other to the true domicile[.]"  *Krone v. Cooper*, 43 Ark. 547, 551 (1884).  *See also Davis v. Holt*, 304 Ark. 619, 804 S.W.2d 362 (1991). Each case must be decided on its own facts.  *Id*.
>
> ***
>
> "No word, it is said, is more nearly synonymous with domicile than home, and it is generally agreed that a man can have but one home or domicile, but that he may have more than one place of residence."  *Krone*, 43 Ark. at 549.[130]

On April 20, 2021, a reliable CS told law enforcement that Mr. Odom was staying at the Rest Inn.[131]  Over the next two days, the CS told officers that Mr. Odom was staying in Room 101 and

---

[130] *Leathers v. Warmack*, 341 Ark. 609, 618, 19 S.W.3d 27, 33–34 (2000).  Both the United States and Mr. Odom agree that *Leathers* lays out the appropriate test for determining a parolee's or probationer's residence or residences. *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:34:41–12:36:34.

[131] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 10:22:42, 11:02:33–40.

had a lot of drugs.[132]   The officers knew Mr. Odom was selling drugs.[133]   The officers saw Mr. Odom exit from Room 101 minutes before he was detained.[134]   And when he was detained, he appeared to have a motel key card.[135]   All this combined would fairly strongly suggest to a reasonable law enforcement officer that Mr. Odom was living or doing business out of Room 101 for some *non-de minimis* length of time.   Whether that length of time was months, weeks, or days, law enforcement had probable cause to believe Odom was continuously and permanently using the motel room during the period.

While it is true that Mr. Odom might have simply been on a temporary sojourn (such as a vacation) for a few days, instead of living or doing business out of Room 101, a reasonable officer would be justified in concluding the opposite was far more likely.   One does not usually go on a temporary sojourn (such as a vacation) to possess and sell a lot of methamphetamine.   In any event, even if the vacationing-versus-residing theories were equally matched, the probable cause standard would be met because it is less than the preponderance of the evidence standard.

Mr. Odom's arguments to the contrary don't persuade the Court.   Mr. Odom emphasizes that the key card found on his person did not open the door to Room 101.[136]   Mr. Odom argues that this dispositively and necessarily extinguished whatever suspicions law enforcement had that Mr. Odom was residing in Room 101.[137]   No one who has had electronic motel keys demagnetize or malfunction would agree.   No rule of law or common sense requires law enforcement to assume

---

[132] *See id.* at 9:30:54–9:31:02.

[133] *See id.* at 9:23:14–18.

[134] *See id.* at 10:26:59–10:27:11.

[135] *See id.* at 10:40:29–36.

[136] *See id.* at 12:16:21–24.   *See also* Def.'s Br. in Supp. Mot. to Suppress (Doc. 62-1) at 4–6.

[137] *See* Dec. 18, 2023 Hr'g Tr. (Rough). at 12:16:24–35.   *See also* Def.'s Br. in Supp. Mot. to Suppress (Doc. 62-1) at 4–6.

that the failure of a motel key to work means the possessor of the key is not an occupant of the room.  Certainly, the failure of the room key to work on Room 101's door somewhat mitigates they key's value to the United States' affirmative case for probable cause.  But even assuming it entirely wiped out the key's value—or marginally placed some weight on the side of Room 101 not being a place where Mr. Odom resides—the remaining information known to law enforcement before the search still chins the probable-cause bar.

Mr. Odom also argues that the CS was not reliable.[138]  It is true that Investigator Temple's testimony concerning the reliability of the CS was general and unspecific.[139]  But nonetheless Investigator Temple credibly testified that the CS has proven reliable on "previous occasions"— meaning at least two.[140]  Moreover, the CS proved to be very reliable during the events leading up to the search, and the officers knew that prior to the search.  The CS's information that the CS could by drugs from Mr. Odom turned out to be right.  The CS's information that Mr. Odom was staying at the Rest Inn (specifically Room 101) turned out to be right.  This fresh reliability is at least as important as the reliability of the CS in previous cases.  In short, the instant circumstances concerning the CS's reliability seem much closer to *United States v. Gabrio* than they do to *United States v. Thabit*.[141]  For certain, our case is not an exact match to *Gabrio*, but the Court does not read *Gabrio* to set a floor on reliability.[142]  The CS's reliability here is just enough to squeak by and support the probable-cause determination.

---

[138] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:19:37–12:20:37.

[139] *See id.* at 10:19:59–10:20:05, 10:20:33–43.

[140] *See id.* at 10:19:55–10:20:05.

[141] *Compare Gabrio*, 295 F.3d at 882–84, *with Thabit*, 56 F.4th at 1149–52.

[142] *See Gabrio*, 295 F.3d at 883–84 (discussing the significance of an informant's "track record of providing reliable information" combined with corroborating facts).

Finally, Mr. Odom argues that, between the information from the CS and the information law enforcement officers obtained directly, at most law enforcement had probable cause to believe Mr. Odom was staying at the motel for two nights.[143]   In Mr. Odom's telling, two nights a residence does not make.[144]   Put differently, knowing someone spent two nights at a motel on its own cannot give a reasonable law enforcement officer probable cause to believe the person resides there.[145] No case holds this.   And the most on-point Arkansas cases suggest that the proper analysis is less focused on quantity (time) and more focused on quality (purpose and use).[146]   Mr. Odom's position fails to wrestle with the fact that law enforcement knew more than that he had stayed in Room 101 for two nights.   They knew from the CS that Odom was selling drugs that he was keeping in Room 101.   And they knew from the CS that he was keeping a substantial amount of drugs there.   This suggests more permanent use than a mere temporary sojourn.

The last challenge Mr. Odom makes is to the use of certain incriminating statements he made during a custodial interrogation.[147]   But his challenge to the use of these statements was predicated on the alleged unconstitutionality of his detention and/or the search.[148]   His point was that the statements at issue were fruits of the poisonous tree.[149]   Given that the Court has found the detention and search to be constitutional, Mr. Odom's fruit-of-the-poisonous-tree argument necessarily fails.   For completeness's sake, the Court notes that an independent challenge to the

---

[143] *See, e.g.*, Dec. 18, 2023 Hr'g Tr. (Rough) at 9:54:21–32, 9:56:01–05, 10:35:50–56.   *See also id.* at 12:10:52–56 (conceding that Mr. Odom was an overnight guest in Room 101).   The Court notes that Mr. Odom essentially conceded that he was staying in Room 101 for a couple of nights prior to April 22, 2021.   *See id.*

[144] *See id.* at 12:14:55–12:17:05.

[145] *See id.*

[146] *See Leathers*, 341 Ark. at 618, 19 S.W.3d at 33–34.

[147] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:30:03–12:31:08.   *See also* Def.'s Reply Br. (Doc. 73) at 4–5.

[148] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:31:40–12:32:18.   *See also* Def.'s Reply Br. (Doc. 73) at 4–5.

[149] *See* Dec. 18, 2023 Hr'g Tr. (Rough) at 12:31:12–12:33:24.   *See also* Def.'s Br. in Supp. Mot. to Suppress (Doc. 62-1) at 5–6.

statements has no legs.  Mr. Odom made his incriminating statements after being fully advised on his Miranda rights and choosing to waive them.[150]  The waiver form, the relevant testimony, and the interrogation video establishes that the waiver was intentional, intelligently made, and voluntary.  The interrogation itself was free from coercion or any other constitutional defect.

## CONCLUSION

For the reasons stated above, the Court DENIES the Motion to Suppress in its entirety.

IT IS SO ORDERED this 19th day of January 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[150] *See* Pl.'s Ex. 16 at 15:39:50–15:40:40.  *See also* Dec. 18, 2023 Hr'g Tr. (Rough) at 11:01:35–41.